1

2

3

4

5

6

7

8                         **UNITED STATES DISTRICT COURT**                    *EMC*

9                         **NORTHERN DISTRICT OF CALIFORNIA**

10    Willie Benton

                                    )
11                  Plaintiff,       )    **CV 08      1073**
                                    )
12    vs.                           )    CASE NO. _____
                                    )
13    AC Transit                    )    **EMPLOYMENT DISCRIMINATION**
                                    )            **COMPLAINT**
14                  Defendant(s).    )
                                    )
15    _____   )

16    1.    Plaintiff resides at:

17          Address  9400 Golf Links Road

18          City, State & Zip Code  Oakland, CA 94605

19          Phone (510) 432 6990

20    2.    Defendant is located at:

21          Address  1600 Franklin St, 4th Floor

22          City, State & Zip Code  Oakland, CA 94612

23    3.    This action is brought pursuant to Title VII of the Civil Rights Act of 1964 for employ-

24    ment discrimination. Jurisdiction is conferred on this Court by 42 U.S.C. Section 2000e-5.

25    Equitable and other relief is sought under 42 U.S.C. Section 2000e-5(g).

26    4.    The acts complained of in this suit concern:

27          a.  __ Failure to employ me.

28          b.  __ Termination of my employment.

Form-Intake 2 (Rev. 4/05)                    - 1 -

1    c. __ Failure to promote me.

2    d. X Other acts as specified below.

3    _see attached_

9    5.    Defendant's conduct is discriminatory with respect to the following:

10    a. X My race or color.

11    b. __ My religion.

12    c. __ My sex.

13    d. __ My national origin.

14    e. X Other as specified below.

15    _age and retaliation for filing this complaint and_
_speaking to AC management about racial discrimination_

16    6.    The basic facts surrounding my claim of discrimination are:

17    _see attached_

25    7.    The alleged discrimination occurred on or about _January 2004 but intensi-_
_fied beginning February 2007_

26    (DATE)

27    8.    I filed charges with the Federal Equal Employment Opportunity Commission (or the

28    California Department of Fair Employment and Housing) regarding defendant's alleged

Form-Intake 2 (Rev. 4/05)    - 2 -

1    discriminatory conduct on or about _August 2007_.

2                                      (DATE)

3    9.    The Equal Employment Opportunity Commission issued a Notice-of-Right-to-Sue letter

4    (copy attached), which was received by me on or about _December 9, 2007_

5                                      (DATE)

6    10.    Plaintiff hereby demands a jury for all claims for which a jury is permitted:

7           Yes _✓_    No _____

8    11.    WHEREFORE, plaintiff prays that the Court grant such relief as may be appropriate,

9    including injunctive orders, damages, costs, and attorney fees.

10

11   DATED: _____        _____

12                                           SIGNATURE OF PLAINTIFF

13

14   *(PLEASE NOTE: NOTARIZATION*              _____

15   *IS NOT REQUIRED.)*                      PLAINTIFF'S NAME

16                                            (Printed or Typed)

17

18

19

20

21

22

23

24

25

26

27

28

Form-Intake 2 (Rev. 4/05)              - 3 -

ATTACHMENT TO COMPLAINT

Answer to question 4 d

Steve Tracy took away my position as Lead mechanic. He blamed the African-American
mechanics for bus break downs. At that time, I had been with AC Transit over 25 years
and I just wanted to continue to work to retire. I did not want to make waves. I also
noticed that the African-American mechanics were being replaced with whites. Steve
Tracy had Mike Cadero take me off the service truck.

Answer to question 6

Mike Cadero and Steve Tracy had been blaming African-American mechanics for AC
Transit bus failures. I got tired of being blamed for something that I was not responsible
for.

In November 2006, I went downtown and told them that there were AC Transit bus
failures but they were not due to African-American mechanics. I told upper AC Transit
management that Mike Cadero threw away bus spare parts when he was cleaning up the
Seminary bus yard for open house. I explained that the buses could not be repaired
sooner because parts were unavailable.

Apparently upper management told Steve Tracy and Mike Cadero what I reported.
Cadero announced to me in front of co-workers that he couldn't wait to be assigned to the
day shift because he was out for me. After that, I was assigned retaliatory job
assignments (see attached letter dated May 30, 2007). I wrote letters to AC Transit upper
management about this treatment and told them that I would be filing an EEO complaint.
The retaliatory job assignments continued. My supervisor made me complete a task that
should have been completed by at least two mechanics and I ended up injuring my leg. I
lost leave and had numerous doctor visits and treatment as a result.

On August 13, 2007, I received retaliatory discipline. I was accused of negligently
repairing a bus that later caught fire on Interstate 880 on July 30 (31) 2007. I
demonstrated to my supervisor that based on AC Transit own records, I was not the last

mechanic to work on that bus. It appears that AC Transit tried to destroy that particular record. Based on my response to the discipline AC Transit had to retract the letter of unsatisfactory performance.

AC Transit scrutinized me closer than it did those who had not filed any EEO complaint. Although it occurs everyday by numerous mechanics, I was again written up for driving over an item at the Seminary bus yard. I have co-workers who can testify to these events. I have work for AC Transit for almost 30 years and I have consistently received good performance reviews.

I am seeking $150,000 in compensatory damages and the return of my sick leave for the time I have been under the doctor's care for the injuries I suffered as a result of the retaliatory job assignments.

Attached are copies of recent articles about AC Transit's mismanagement and its attempts to blame others rather than management for its dismal performance over the past years.

May 30, 2007

Mike Cadero, Foreman
Steve Tracy, Superintendent
AC Transit Maintenance Facility
1100 Seminary Avenue
Oakland, CA 94621



Re: Willie Benton; Racial and Age Harassment

Dear Sirs:

I hereby demand that you cease, immediately, your racial and age harassment against me.

I discussed your treatment of me with Maintenance Manager, Joe DePrespero, over a year ago but instead of it improving, it has gotten worse.

On April 9, 2007, at approximately 11:30 a.m., Mike Cadero said to me as I stood near the Foreman's Office, "When I come on days, I'm going to take both of my feet and put them knee deep in your ass", as he left the standard Monday meeting.

In early May, 2007, Mike Cadero stated the very same thing to me as he left the standard Monday meeting.

On May 21, 2007, Mike Cadero assigned to me the repair of a right front seal that another mechanic previously worked on. This assignment was in contravention of the Seminary Yard's practice of returning the assignment to the person who began it. While completing this assignment I took a cigarette break (which Mike Cadero attended at the same time with me). After I completed the repair, Mike Cadero informed me that it was unsatisfactory to him because I left for a cigarette break! This incident was puzzling to me because Mike Cadero does not complain when Richard Hardy and Robert Jeffries, floor mechanics like me who also report to Mike Cadero, spend 30 minutes at a time in the office goofing off. It is noted that Mr. Hardy and Mr. Jeffries, who are significantly younger than me, are Caucasian and I am African American.

On May 22, 2007, Mike Cadero assigned the rear bellows to me. This was puzzling to me because for the past 2-3 years, Victor Li, the working Relief Foreman, assigned work to me. This is even more puzzling to me because Mike Cadero has not directly assigned work to anyone else but me.

On May 23 and 24, 2007, Mike Cadero assigned to me rear brake jobs. I am perplexed because over 2 years ago Superintendent Tracy informed the Seminary Yard that brake assignments must be rotated. If this policy has changed, no one informed me.

I have consulted an attorney who practices employment discrimination law. I was advised to send this letter to you with copies to your superiors and the union. It is my understanding that your actions are jeopardizing the financial well-being of AC Transit because they state a claim of harassment based on race and age. This letter provides you with an opportunity to protect AC Transit by ceasing this type of behavior. Additionally, to the extent that some of your actions are not illegal but instead, unprofessional, such behavior must also cease. Your use of vulgarity and condescending tone are inappropriate in the workplace. As a supervisor, more is expected of you. I assure you that if these violations of AC Transit practices and procedures, and unprofessional behavior continue I will pursue heightened legal remedies.

Sincerely,



Willie Benton

Cc:  Board of Directors, AC Transit
     Rick Fernandez, General Manager, AC Transit
     Joe DePrespero, Maintenance Manager, AC Transit
     Yvonne Williams, Local 192, AC Transit

# AC Transit
EAST OAKLAND MAINTENANCE

August 10, 2007



Willie Benton, Badge No. 81473
Journeymen Mechanic
East Oakland Division

## SUBJECT:   Unsatisfactory Work Performance/Neglect of Duty

This is to notify you that you performed a Technical Inspection on coach #2020 that
indicates Unsatisfactory Work Performance.

**Specific:**     On Tuesday, July 31, 2007 the driveline in coach 2020 came apart on the
freeway causing severe damage to several components which generated a
fire totaling the coach. The driveline was inspected and the results show no
grease in the u-joints and the grease fitting that applies grease to the u-joints
was missing. You performed the Technical Inspection on coach 2020 on
June 6, 2007. Your inspection of the driveline shows satisfactory condition.

You failed to perform your required duties when performing the Technical
Inspection.  Your neglect to perform your duties has caused undue stress
and imbursement to the District.

The following adverse entries were considered in determining the
appropriate discipline:     **NONE**

## Proposed Discipline:
**X**     1.     An Adverse Entry may be Entered Upon your Personnel File.

**X**     2.     "You May be Suspended" "You May be Discharged"

**Note:**     Further discipline will be assessed upon a repetition of this offense, up to
and including discharge.

This letter is given to you pursuant to Part I, Section 3.0 of the Agreement between the
District and the Union. The agreement provides that you have the right to request a
hearing within ten (10) days of receipt of these charges. If a request for a hearing is not
timely made, it is waived and the above listed discipline will be implemented.

Sincerely,

Steve Tracey
Maintenance Superintendent
East Oakland Division

cc:     Amalgamated Transit Union, Local 192
John Rudniski
Labor Relations
File



*Chartered 1901*
*AFL-CIO/CLC*

# *Amalgamated Transit Union*
# *Local 192*

*8460 Enterprise Way*
*Oakland, CA 94621-1318*

August 13, 2007

Steve Tracey
Maintenance Superintendent
East Oakland Facility
AC Transit District

Dear Mr. Tracey:

We are in receipt of a Notification of Charges letter dated **August 10, 2007,** and received **August 13, 2007** at this office.  Addressed to **Willie Benton, Badge #81473** for:

### - Unsatisfactory Work Performance.

The proposed discipline is: **An Adverse Entry may be entered upon your personnel file.  "You may be suspended" " You may be discharged."**

We are requesting a hearing per Section 3.02 and 6.0 of the Agreement.  In the event of a discharge, the Union requests a written transcript within fifteen days after the date of the hearing.

Let's meet soon to discuss this issue.

Sincerely,

James Gardner
Assistant/Business Agent
Maintenance/Clerical Stores

JG: pac
opeiu#29/afl-cio

---

The Union does not waive any rights or time limits under the Agreement in this case.

---

TEL: (510) 635-0192                                    FAX: (510) 635-6539

| | | | | | |
|---|---|---|---|---|---|
| **Yvonne M. Williams** | **Rhodessa Stinger** | **Rebecca Jones-White** | **Robert L. Scott** | **James R. Gardner** | **David Lyons** |
| *President/* | *Vice-President* | *Financial Secretary -* | *Asst. Business Agent* | *Asst. Business Agent* | *Recording* |
| *Business Agent* | | *Treasurer* | *Transportation* | *Maintenance* | *Secretary* |

August 19, 2007

Willie Benton
Badge Number 81473

Steve Tracy, Superintendent
Seminary Yard, AC Transit

Rick Fernandez, General Manager
AC Transit

Board of Directors
AC Transit

Barbara Lee
Congresswoman

Subject: Willie Benton - August 13, 2007
          Additional Discrimination/retaliation

Dear Sirs:

On August 13, 2007, Superintendent Steve Tracy issued me a letter for unsatisfactory performance due to my alleged failure to inspect Bus Number 2020. According to Superintendent Tracy, my alleged failure caused the bus to catch fire on Interstate 880 on July 31, 2007. In that letter Superintendent Tracy stated that I was the last person to inspect Bus Number 2020 on June 6, 2007.

The issuance of this letter to me is without foundation and was done in retaliation for my prior EEO activities when I informed upper management at AC Transit about discrimination at the Seminary Yard. Superintendent Tracy's allegation that I was at fault is totally unsupported by the record. More importantly, Superintendent Tracy attempted to obscure the record in order to discipline me.

Work order records will indicate assignments of those who worked on Bus Number 2020. On August 13, 2007, after reviewing the letter for unsatisfactory performance, records that were usually kept in the normal course of business at the Seminary Yard were suddenly unavailable and remain unavailable to this date. I had to obtain the records from Central Maintenance Facility at 106th Avenue, a copy of which is attached. This AC Transit generated report indicates that I was not the last person to inspect Bus Number 2020 prior to the July 31, 2007 fire. This report indicates that July 10, 2007, was the last date Bus Number 2020 was serviced by the Seminary Yard, #2743. Further, it indicates that maintenance and other inspections were performed on Bus Number 2020 after July 10, 2007, at the Hayward Yard, #2963. As you are aware, I have never worked at the Hayward Yard.

Consequently, the letter of unsatisfactory performance should be rescinded. Additionally, it is regrettable that AC Transit continues to retaliate against me even though I had requested the cessation of discriminatory and retaliatory actions against me. AC Transit will have to answer for this disregard of my civil rights.

Sincerely,

Willie Benton

**Search for Work Orders**

WorkOrder   Edit   View   Tools   Help

Primary Criteria | Secondary Criteria | Dates | Job Codes | Address | Reference Codes |

**Work Order**

| | |
|---|---|
| Search Method: | All |
| Work Order No: | |

**Primary Selection Criteria**

| | | | |
|---|---|---|---|
| Equip Search Type: | Equipment or Plant Number | Eq List Ind: | |
| Equip Ref: | 2020 | Eq List Type: | |
| Work Group: | | Request Id: | |
| System Status: | All | Parent W/Order: | |
| Crew: | | Project Number: | |
| Originator Id: | | Assigned to: | |
| Shutdown No: | | Estimate No: | |
| Account Code: | | All Districts: | |

Search

New Search

| | District | Work Order | Desc | Equipment Reference | Work Group | Crew | Raise Date | Originator Id | Status | Plan Start Da |
|---|---|---|---|---|---|---|---|---|---|---|
| 600 | ACTR | 00513754 | Cleaning: Washout Floors | 2020 | 2743 | | 6/19/2007 | 0000041379 | Closed | |
| 601 | ACTR | 00514196 | Cleaning: Washout Floors | 2020 | 2743 | | 6/21/2007 | 0000041379 | Closed | |
| 602 | ACTR | 00516809 | Prev. Maint. 3000 mile service | 2020 | 2763 | | 6/30/2007 | 0000000754 | Closed | 7/7/2007 |
| 603 | ACTR | 00516810 | 3000 Mile Cleaning | 2020 | 2763 | | 6/30/2007 | 0000040432 | Closed | 7/7/2007 |
| 604 | ACTR | 00519457 | D4 RCL Complaint: Stalling | 2020 | 2743 | | 7/10/2007 | 0000030565 | Closed | |
| 605 | ACTR | 00519620 | Inspect Cooling System, DC Writeup | 2020 | 2763 | | 7/11/2007 | 0000041158 | Closed | |
| 606 | ACTR | 00519738 | Change Water Pump | 2020 | 2763 | | 7/11/2007 | 0000041253 | Closed | |
| 607 | ACTR | 00520225 | Check Engine Light | 2020 | 2763 | | 7/14/2007 | 0000041651 | Closed | |
| 608 | ACTR | 00521978 | Repair Passenger Door | 2020 | 2753 | | 7/20/2007 | 0000040263 | Closed | |
| 609 | ACTR | 00522625 | Inspect Turntable | 2020 | 2763 | | 7/21/2007 | 0000000754 | Closed | 7/27/2007 |
| 610 | ACTR | 00522626 | Prev. Maint. 6000 mile service AG300 | 2020 | 2763 | | 7/21/2007 | 0000000754 | Closed | 7/27/2007 |
| 611 | ACTR | 00522627 | 3000 Mile Cleaning | 2020 | 2763 | | 7/21/2007 | 0000000754 | Closed | 7/27/2007 |
| 612 | ACTR | 00522628 | Check Engine Exhaust Opacity | 2020 | 2763 | | 7/21/2007 | 0000000754 | Closed | 7/27/2007 |
| 613 | ACTR | 00522629 | Prev. Maint. 6000 mile Steam Clean | 2020 | 2763 | | 7/21/2007 | 0000000754 | Closed | 7/27/2007 |
| 614 | ACTR | 00523449 | D-6 Road Call | 2020 | 2763 | | 7/24/2007 | 0000041136 | Closed | |
| 615 | ACTR | 00524101 | Inspect Fuel System, DC Writeup | 2020 | 2763 | | 7/27/2007 | 0000041059 | Closed | |

618 matches

| | |
|---|---|
| Date Printed | 17 August 2007 09:27:05 |
| Ellipse UserId | 41134 |
| | |
| Program Name | msq620.exe |
| Program Description | MSQ620 Work Orders |
| Version | ABE |
| Revision | 133 $   Date: Wednesday, September 06, 2006 |
| Module | 3620 |
| Product Version | 5.2.3.2 |
| File Version | 5.2328.0.133 |
| Location | D:\Mincom\MIMSOP~1\523~1.2\Bin\ |
| Compiled Date | 11 September 2006 10:31 |
| Form Name | frmMsq62001SearchView |

  

Alameda-Contra Costa Transit District 

AUG 2 9 2007

By_____

**Human Resources Department**

**August 28, 2007**

Ms. Yvonne Williams, President
Amalgamated Transit Union, Local 192
8460 Enterprise Way
Oakland, CA 94621

### Labor Hearing File # D07-354; Willie Benton, #81473

Dear Ms. Williams:

In accordance with the terms of the current Collective Bargaining Agreement, a hearing was held at the East Oakland Facility on August 22, 2007, concerning a letter dated August 10, 2007, given to Journeymen Mechanic Willie Benton for Unsatisfactory Work Performance/Neglect of Duty.

**The Discipline Indicated**: Adverse Entry/YMS/YMD

#### Attendees:

| | |
|---|---|
| Willie Benton | Journeymen Mechanic |
| Eric Darby | Shop Steward for ATU, Local 192 |
| Steve Tracey | Maintenance Superintendent D-4M |
| Bob Bithell | Tech. Serve. Mgr., District Witness |
| Dan Hoover | Maint. Supervisor, District Witness |
| Roland Fecteau | Sr. Maint. Supervisor, District Witness |
| Adrian Smith | Union Witness |
| Richard Hardy | Observer |
| Angela Dangerfield | Hearing Officer |

**Summary of the case:** The District alleges that on Tuesday, July 31, 2007, the driveline in coach 2020 came apart on the freeway causing severe damage to several components which generated a fire totaling the coach. The driveline was inspected and the results show no grease in the u-joints and the grease fitting that applies grease to the u-joints was missing. Mr. Benton performed the technical inspection on coach 2020 on June 6, 2007. His inspection of the driveline indicated it was in satisfactory condition.

Mr. Bithell testified that the primary cause of the failure was a lack of lubrication of the front universal joint of the propeller shaft. He stated that because of the failure and the resulting fire the coach was a total loss.

Alameda-Contra Costa Transit District



**Willie Benton**
**Page 2 of 2**

Mr. Hoover testified that the Job Card for the Technical Inspection was completed by Mr. Benton. He stated that two mechanics worked on coach 2020 and that the inspection of the u-joint would have been performed by the mechanic working on the "bottom" of the vehicle. Mr. Hoover testified that the determination that Mr. Benton had worked on the bottom was based on his badge number written next to items consisting of "bottom" work.

Mr. Benton testified that he worked on the "top" while doing the Technical Inspection of coach 2020. He stated that he changed the oil filter via the panel located inside of the coach.

The parties reviewed the Job Card and agreed on the following:
Change engine air filter, completed by Mr. Benton, was a "top" job.
Change fuel filter, completed by Mr. Benton, was a "top" job.
Change transmission fluid and filters, completed by both mechanics, was "bottom" job.
Change oil and filters, completed by Mr. Benton, could be done from the top or the bottom.

**The District's position is** to sustain the letter of charges with a 10-day suspension. The drive shaft was reported to be in satisfactory condition in error causing a catastrophic failure resulting in the total loss of the bus. **The Union's position is** to rescind the letter of charges in its entirety. The District did not prove that Mr. Benton was the last person to perform an inspection on the coach.

**Decision:** After listening to the witnesses and reviewing the documentation, I am rescinding the letter of charges in its entirety. The records provided by the District imply that Mr. Benton worked on the top of the vehicle and would not have been responsible for inspecting the u-joint during the last Technical Inspection.

Sincerely,

Angela Dangerfield
Hearing Officer

cc:    Employee; D4M Superintendent; D4M Transit Office Manager; Human Resources; Labor Hearing File #D07-354

---



**U.S. Department of Justice**

Civil Rights Division
NOTICE OF RIGHT TO SUE
WITHIN 90 DAYS

---

CERTIFIED MAIL
5053 2192

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson, EMP, PHB, Room 4239*
*Washington, DC 20530*

Mr. Willie Benton
9400 Golf Links Rd.
Oakland, CA  94605

December 5, 2007

Re:  EEOC Charge Against AC Transit
     No. 555200700778

Dear Mr. Benton:

     Because you filed the above charge with the Equal Employment
Opportunity Commission, and the Commission has determined that it
will not be able to investigate and conciliate that charge within
180 days of the date the Commission assumed jurisdiction over the
charge and the Department has determined that it will not file any
lawsuit(s) based thereon within that time, and because you have
specifically requested this Notice, you are hereby notified that you
have the right to institute a civil action under Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq.,
against the above-named respondent.

     If you choose to commence a civil action, such suit must be
filed in the appropriate Court within 90 days of your receipt of
this Notice.  If you cannot afford or are unable to retain an
attorney to represent you, the Court may, at its discretion, assist
you in obtaining an attorney.  If you plan to ask the Court to help
you find an attorney, you must make this request of the Court in the
form and manner it requires.  Your request to the Court should be
made well before the end of the time period mentioned above.  A
request for representation does not relieve you of the obligation to
file suit within this 90-day period.

     This Notice should not be taken to mean that the Department of
Justice has made a judgment as to whether or not your case is
meritorious.

                         Sincerely,

                    Grace Chung Becker
                Acting Assistant Attorney General
                     Civil Rights Division

        by      *Karen L. Ferguson*

                  Karen L. Ferguson
            Supervisory Civil Rights Analyst
             Employment Litigation Section

cc:  Oakland Local Office, EEOC
     AC Transit

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To:  Willie Benton<br>9400 Golf Links Road<br>Oakland, CA 94605 | From:  Oakland Local Office<br>1301 Clay Street<br>Suite 1170-N<br>Oakland, CA 94612 |
|---|---|

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 555-2007-00778 | Julian F. Melendres,<br>Investigator Support Asst | (510) 637-3242 |

*(See also the additional information enclosed with this form.)*

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in a federal or state court **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

☐ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☐ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☒ The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

Michelle L. Nardella,
Director

*(Date Mailed)*  12/4/07

cc:    Stokes Stokes
Administrator
AC TRANSIT
Human Resources Department
1600 Franklin St., 4th Floor
Oakland, CA 94612

Form 161-B (3/98)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS  –  **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should keep a record of this date. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

### PRIVATE SUIT RIGHTS  –  Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/00 to 12/1/00, you should file suit before 7/1/02 – not 12/1/02 – in order to recover unpaid wages due for July 2000. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

### ATTORNEY REPRESENTATION  –  Title VII and the ADA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

### ATTORNEY REFERRAL AND EEOC ASSISTANCE  –  All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, please make your review request within 6 months of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

August 15, 2007

Martin I. Scheir, Senior Investigator
U.S. Equal Employment Opportunity Commission
Oakland Local Office
1301 Clay Street, Suite 1170-N
Oakland, CA 94612-5217

Re: Clarification of Charge of Discrimination – 555-2007-00778

Dear Mr. Scheir:

You have not explained the charge correctly. This EEO charge includes a hostile work
environment claim and discrimination based on a disparate treatment theory all because
of age, race, retaliation.
I informed you that Steve Tracey represented to AC Transit that the mechanics were at
fault for AC Transit's slow turnaround in returning buses to service. Steve Tracey then
began a pattern of demoting older African American mechanics, including myself, and
blaming the slow turnaround to the quality of performance of older African American
mechanics. Finally, around November 2006, I informed Steve Tracey that the slow
turnaround was really due to Mr. Cordiero's disposal of spare parts and not the quality of
performance of the older African American mechanics. After Mr. Cordiero found out that
I defended the performance of older African American mechanics when I told Mr. Tracey
about the disposal of spare parts, I have been subjected to continued discrimination
because of my age and race and retaliation. Beginning about April 2007, Mr. Cordiero
made threats to me at the workplace in front of co-workers; assigned undesirable tasks
exclusively to me which had previously been alternated among everyone; and assigned
me solely to a job intended for more than one mechanic which resulted in injury to me.
Even though AC Transit management is aware of this situation, Steve Tracey continues
to discriminate and retaliate against me.

Sincerely,

# EAST BAY EXPRESS

Printed from the East Bay Express Web site:
http://www.eastbayexpress.com/news/the_buses_from_hell/Content?
oid=627762

# The Buses From Hell

*After AC Transit purchased costly foreign buses that drivers hate and many riders
fear, its service and finances took a wrong turn.*

By Robert Gammon

January 23, 2008

Pamela Daniels lost her left leg to a Van Hool bus. In
September 2005, she boarded one of AC Transit's expensive
new Belgian-made buses in downtown Oakland. But as the 51-
year-old library assistant was trying to step on to the vehicle's
elevated platform to get to her seat, the driver pulled away from
the curb and she was thrown to the floor. Her fall aggravated an
old injury, and a nasty, painful infection took hold. "She ended
up getting a below-the-knee amputation," said her attorney,
Miles Cooper. "It's been a very difficult situation."

Records show that agency officials were aware the Van Hool
buses were dangerous, especially for the elderly and people like
Daniels, who had mobility problems and wore a special rocker-
bottom shoe on her left foot. Yet for nearly three years before
she lost her leg, AC Transit repeatedly ignored complaints
voiced by both passengers and bus drivers.

In fact, agency officials have steadfastly refused to heed critics
of their Belgian-made buses, which they began buying en masse
six years ago. The Van Hools — dubbed Van Hells by some
riders — are the cornerstone of AC Transit's grand plan to



Jared Gruenwald

AC Transit decided it had to have
a bus with low floors and three
doors, so it went all the way to
Belgium for the Van Hools.



Jared Gruenwald

The agency's longer accordian-
style buses have four doors: two
in front and two in back.

Photo Courtesy of Mass Transit Magazine.
www.masstransitmag.com

transform East Bay transportation into a European-style system in which the Belgian buses
would take center stage. The agency calls its plan Bus Rapid Transit, and it would create bus-
only lanes down the center of some of the East Bay's busiest streets.

AC Transit officials chose the Van Hools because they have extra doors and low floors, so riders
don't have to walk up several steps to get on them and can board and exit more quickly.
Though the Belgian buses cost more than some American-made models, are more expensive to
ship, and don't have to undergo the same safety tests as domestic buses, no other US bus
maker can match their specialized features. So in January 2002, the agency signed an exclusive
deal with Van Hool and started importing its buses from abroad. "We found that no bus in the
United States could accommodate the needs of rapid transit," AC Transit General Manager
Rick Fernandez said during a recent interview.

To this day, Fernandez has nothing but praise for the Belgian
buses and their manufacturer, arguing that the Van Hools are
best suited to his agency's plans. But while they've been sold as
the wave of the future, the new buses have been nothing short
of a disaster. Indeed, a three-month investigation, which
included dozens of interviews and a review of more than 5,000
pages of public documents, discovered that the very same
features that prompted AC Transit officials to fall in love with
the buses have injured drivers and riders and prompted both
groups to hate and fear them.

In addition, AC Transit's European bus-buying spree
contributed to one of the district's worst financial downturns in
decades. In fact, since Fernandez took control of the agency in
the late 1990s, its fortunes have worsened in almost every
measurable category. Ridership has plummeted, costs have
skyrocketed, and the agency has slashed service. The only way it
has remained solvent in recent years is by repeatedly raising
fares and convincing East Bay voters to tax themselves more.



AC Transit General Manager Rick
Fernandez

Jared Gruenwald



In short, AC Transit's effort to transform the car-oriented East
Bay into a European bus metropolis came not only at the
expense of its own employees and passengers, but also as the
agency was shortchanging taxpayers and riders.

And much of it was unnecessary.

Throughout most of its history, AC Transit has operated as a
no-frills commuter workhorse. Its American-made diesel buses
routinely carried more than 60 million passengers a year up
and down the eastern shores of San Francisco Bay, from
Richmond to Fremont. By the mid-1990s, the agency was
enjoying boom times under the command of general manager
Sharon Banks. But then, in early 1999, Banks suffered a series
of debilitating strokes and died.

These raised platforms pose a
hazard to riders when drivers
don't wait for them to take their
seats before moving.

AC Transit's seven-member board of directors immediately
promoted one of her deputies, Rick Fernandez. He had arrived in the East Bay a few years
earlier after a career in midlevel management at New Jersey Transit and had never run a
transit agency before.

Within a year of taking over, Fernandez was talking openly about transforming AC Transit into
an über-efficient European-style transportation system. His vision matched perfectly with that
of the agency's liberal and progressive board members, who yearned for a mass transit system
that could rival that of London, Paris, or Amsterdam.

In August 2000, Fernandez and his staff asked European industry giant Mercedes-Benz if it
was ready to export its wildly popular Citaro bus to the United States. They also talked to
officials from the Van Hool company, which is based near Antwerp and named after the family

that founded and runs it. Compared to Mercedes-Benz, which at the time was rolling more than 13,000 buses off its highly advanced assembly lines, Van Hool of Lier, Belgium was a small, boutique manufacturer, less than one-seventh the size.

After taking a European junket that November with officials from the Federal Transit Administration, Fernandez and three of his top deputies toured the Mercedes-Benz and Van Hool plants in April 2001. They fell in love with the Van Hool design, particularly its low floors and three doors — one more door than on American buses. "We were very impressed," Fernandez said. "What we found was that Van Hool was a true custom builder."

The general manager was envisioning a Bus Rapid Transit system, "BRT" for short, which would turn the middle lanes of some of the East Bay's most crowded thoroughfares into light-rail lines, only featuring Van Hool buses instead of trains. Passengers would purchase their tickets from kiosks erected in center-of-the-street platforms, and then step onto the waiting bus through any one of its open doors.

In its current incarnation, AC Transit hopes to install BRT in the two center lanes of Shattuck and Telegraph avenues, International Boulevard, and East 14th Street, from downtown Berkeley to San Leandro. The agency believes that prohibiting cars and trucks from using the two middle lanes along a fifteen- to seventeen-mile stretch in the heart of the East Bay is the best way to force people out of their vehicles and into buses. But critics say the plan will cause horrific traffic jams, forcing rush-hour motorists onto quiet neighborhood streets. The $400 million proposal, which does not include the costs of the Van Hool buses, is in its final environmental review stage.

Despite his often-stated claim that no other bus can fill AC Transit's needs, Fernandez acknowledged that most of the other US cities developing Bus Rapid Transit systems are buying domestic buses. None of them has plunged so deeply into the foreign-bus market, and only two other transit systems in the United States also use Van Hool buses, both on a very limited basis.

By contrast, AC Transit has maintained an exclusive contract with Van Hool for the past six years. Through July 2007, the agency had spent $97.2 million in public funds, buying 236 of its buses, which ranged in price from $300,000 to $530,000 each, depending on the size of the vehicle.

From a distance, the Van Hools are nearly indistinguishable from their American-made counterparts, except for the extra door. They're diesel-powered and no more fuel-efficient than domestic buses, yet they cost more than some American models. Records show that in 2000, AC Transit paid $266,000 each for several forty-foot-long buses made by an Alabama manufacturer. Just two years later, the agency paid $300,000 for the same-sized Van Hools. In addition, freight charges on the Belgian buses range from $7,500 to $13,500, compared to about $2,500 or less for those made in America.

Some critics describe Fernandez and AC Transit's love affair with the Belgian buses as "an obsession." Whether that's true or not, public records show that less than four months after signing the Van Hool deal, Fernandez described the agency's finances as "shaken." And as the agency continued to pursue its dream of a European-style transit system, its fortunes worsened and it lost millions of riders. For critics, that raises questions about whether it's even capable of

making BRT work.

During Fernandez' tenure at the helm of AC Transit, the agency's operating costs have spiraled out of control. Between 2000 and 2007, rising salaries and medical benefit costs, along with higher fuel prices and expensive buses, caused the agency's annual operating expenses to spike from $195.2 million to $290.5 million. The accelerating costs, in turn, forced Fernandez to declare a fiscal emergency in 2004, and to obtain at least two large loans totaling $45 million in 2004 and 2006. He even had to sell 29 Van Hool buses to close a budget deficit.

But that was not enough, so the agency slashed service across the board. From 2002 to 2007, it cut its total number of bus lines from 157 to 93, thus reducing the number of neighborhoods it serves. During the same period, it also downsized its fleet from 771 buses to 632, retiring hundreds of older buses as the new Van Hools came on line.

The cuts disenfranchised some of AC Transit's most faithful riders. Sharon Yale, who has been riding AC Transit for more than four decades, said the agency eliminated a bus line that used to stop near her Montclair district home. "I bought my house 44 years ago, because the bus came to the corner," said the 68-year-old retiree, who doesn't drive and calls herself "100 percent public transportation dependent." She now has to walk uphill nearly a mile from the new bus stop to her door. "It seems like AC Transit has been doing everything but giving service to people."

In fact, during the past decade, service has often taken a backseat to the agency's desperate attempts to balance its books. From 1997 to 2005, AC Transit raised fares from $1.25 to $1.75 per rider, making its rates as high as those of any local bus service in the Bay Area. It also convinced East Bay voters to approve one sales tax and two property taxes in the past eight years — Measures B, AA, and BB. The last one, BB, which voters approved overwhelmingly in 2004, is a $48-a-year parcel tax that has generated about $17 million annually for the agency.

But the service cuts and fare increases have just made many riders angry. David Vartanoff, a 63-year-old electrician who cannot drive because of a disability, said the elimination of the 17 and 64 bus lines threw a wrench into his cross-town commute from his home near Alcatraz and Telegraph avenues in North Oakland. He's also frustrated about AC Transit's decision to limit its 25-cent bus transfers to only one additional bus ride. The agency used to let riders with longer commutes connect to several buses without paying another full fare. Now when he transfers to more than one bus, he has to pay $3.75 or more for a trip that used to cost no more than $2. "Not only has service vaporized, but it costs more to use it," he said.

None of these remedies have cured the agency's financial woes. Fewer buses and bus lines predictably resulted in fewer riders. According to statistics compiled by the Metropolitan Transportation Commission, a state agency that oversees state and federal transportation funds, AC Transit lost about 9 percent of its annual passengers from 2000-1 through 2005-6 — a staggering 6.1 million people, or more than twice the total population of Alameda and Contra Costa counties.

The decline in passengers coupled with the rising costs has only made matters worse. A key measurement of any public transportation agency's financial health and its ability to be self-sustaining is known as "fare box recovery." This measurement calculates how well rider fares cover an agency's annual operating costs — the higher the fare box recovery, the more

financially efficient the agency.

Throughout its history, AC Transit's fare box recovery has been below par. Between 1997 and 2001, for example, it was just 25 percent, or about one-third lower than the national average, according to the agency's own records. That is, riders paid about 25 cents of every dollar the agency spent on annual operating costs, while taxpayers covered the rest. During the past five years, the agency's fare box recovery has turned abysmal, plummeting to about 17 percent, or about half the national average.

Fernandez defends AC Transit's financial record and said there were many reasons why its fare box recovery nose-dived. "It's hard to take a look at it in isolation," he said. "Our costs have skyrocketed. The cost of medical has gone up dramatically. Fuel costs are up dramatically."

But it's also the case that buying expensive European buses has cost the agency several million dollars in the past half decade. And the costs for riders are likely to keep rising.

Fernandez said AC Transit's continuing financial problems may result in another fare hike this year. In a November memo to the agency's Board of Directors, he warned that it risked losing millions in state funds each year if it could not push its fare box recovery back above 20 percent. On Wednesday, January 23, the AC Transit board is scheduled to consider Fernandez' plan to raise fares to $2.

As riders dig deeper into their pockets, Fernandez and his top aides are learning that all the time and money they spent pursuing Belgian-made buses may have been wasted. A new report reveals that drivers, the people most familiar with the Van Hools, don't like them and rate them as mediocre compared to American-made buses.

In a survey for the agency conducted in September, but only made public last week, many AC Transit bus drivers roundly criticized the Van Hool buses. Some of the critiques were detailed; others short and blunt. "The buses are junk," one driver said. Another added: "Don't like these buses, they're bad." A third remarked: "From my experience, these are the worst buses we have."

In sixteen categories overall, from braking and visibility to handling and acceleration, the 230-plus drivers rated the Van Hools a "3" for "average" on a five-point scale in which a one was considered "poor," and a five, "excellent." The results were not what Fernandez expected to hear, nor was the drivers' repudiation of his oft-repeated claim that the Belgian buses outperform domestic ones. In the category of "overall comparison to other buses," the drivers rated the Van Hools below average — giving it 2.82.

But the drivers reserved one of their lowest marks — a 2.38 — for "ride quality." In fact, longtime AC Transit driver David Lyons said the Van Hools ride so poorly that they put him out of work. The 27-year AC Transit driver said a painful pinched nerve in his neck forced him to take a five-month leave last year. "I put in my request not to drive them," he said of the Van Hools after he returned to his job. "It really makes a difference."

Because of their three-door design, the Van Hools have a shorter wheel base — the distance between the front and back wheels — than their American counterparts, making them difficult to drive and hard on bus drivers' bodies, Lyons said. The toughest model to handle, he said, is

the forty-foot Van Hool. AC Transit purchased 105 of them through July 2007, at an average cost of $308,000 each, records show. "The suspension is real unstable because of the short wheel base," Lyons said. "It causes the bus to bounce up and down a lot."

During several recent bus rides around Oakland and Berkeley, other AC Transit drivers shared Lyons' disdain for the Van Hools. The short wheel base, they said, also makes tight corners tough to negotiate because the rear end — where the third door is located — is much longer than American-made buses. "We have a lot of trouble with these buses, especially when you turn," said German Zambrano, an eighteen-year AC Transit veteran, as he was driving a forty-foot Van Hool. Many other drivers seconded his complaint in the survey.

But as bouncy as the forty-footers are, this reporter found the sixty-foot, accordion-style Van Hools an even rougher ride. AC Transit plans to make these four-door sixty-footers, which cost about $530,000 apiece, the backbone of its Bus Rapid Transit system. But on the potholed streets of Oakland, along San Pablo Avenue and East 12th Street, the sixty-footers' suspension makes them a poor choice for commuters. In the rear of the bus, the ride was so jarring that it was impossible to read a newspaper or magazine.

In terms of overall safety and riding comfort, it's not clear how the Van Hools stack up against domestic buses. Under a 1987 law, American buses purchased with federal funds must undergo a rigorous review at the nation's testing center in Altoona, Pennsylvania before they're certified as safe for drivers and passengers. But because AC Transit buys Belgian, the Van Hools have never been to Altoona.

Whether this lack of US safety testing has put AC Transit drivers and riders in harm's way isn't clear. But judging from comments and complaints riders registered with the agency over the past half-decade, officials knew early on that many passengers were afraid of the Van Hools.

North Oakland resident Joan Lichterman, who has been riding AC Transit for 34 years, calls the new buses "Van Hells." "A lot of people call them that," the 65-year-old said. "Neither the drivers nor the passengers like them. And getting into the seats is just horrible. Drivers don't want to wait for people to sit down before they lurch off."

Lichterman's complaints are echoed by the vast majority of the 100-plus passenger comments that AC Transit has received since the new buses went into service. The complaints also raise concerns about whether the Van Hools are dangerous, especially for the elderly and those with mobility problems.

Many of the criticisms centered on the elevated platform seating that resulted in Pamela Daniels losing her leg. And the complaints go to the heart of why AC Transit fell for the Van Hools in the first place.

One of the two primary reasons for why the agency went Belgian is the low floors. The low floors mean that when the bus stops, passengers don't have to climb several steps to get on board. However, they do have to step up to a 12-inch-high raised platform to get into their seats — often when the bus is already moving. The same problem occurs when they're trying to get out of their seats in anticipation of their stop.

One Alameda rider summed up the Van Hool elevated platform hazard in a July 2004

complaint made with the agency: "I was riding from Alameda City Hall to Webster & Santa Clara on Friday afternoon, 7/23/04. I was seated on one of the raised 'platform'-type seats on the new model #51 bus. When we approached my stop, I rang for a stop and stood up to leave the bus. Forgetting momentarily that I was on the elevated seat, I misjudged the distance to the floor, lost my footing, slipped and fell into the metal frame of the seat across the aisle, spraining my wrist and fracturing two ribs."

Drivers, meanwhile, are caught between angry riders and AC Transit brass who demand faster commutes and on-time performance. If drivers wait to pull away from the curb until all passengers are safely seated, or tell riders to remain in their seats until the bus comes to a complete stop, it slows down the commute, thereby defeating the purpose of Bus Rapid Transit.

Fernandez, however, downplays these criticisms. "It's a small percentage of people who complain," he said of the passengers in an interview before the drivers' survey was released. He also pointed to an agency graphic that showed that while passengers suffered 67 percent more falls on the Van Hools in their first year of service, the number of falls since May 2004 has been about the same as on American-made buses. Finally, he pointed to a survey the agency conducted in October 2002 of passengers riding on the first two Van Hool prototypes. "We got a very positive result," he said.

However, the neutrality of that survey seems suspect. For example, the questionnaire touts the Van Hools' design features before asking passengers a series of questions about some of those same features. "This bus has some very important design features that distinguish it from any other bus in North America," the survey began, and then listed ten features, including "extra doors" and "a low floor from the front to the very back, requiring only one small step between the curb and the front of the bus."

Joyce Roy, an East Bay transit activist and leading critic of the Van Hools, called the survey very unscientific. "You don't tell people how great the bus is and then ask them what they think of it," she said. "And the survey never asks about having to step up to your seat."

Moreover, an AC Transit internal report obtained for this story shows that the elevated platform, which characterizes the Van Hools, makes the Belgian buses more hazardous for riders once they pay their fare. According to the report, the number of passengers who fell after they boarded a Van Hool bus in 2003-04 outnumbered those on American-made buses by more than 600 percent. And though the number of onboard falls on Van Hools has declined since then, they still outpace American buses by nearly a two-to-one margin.

Pamela Daniels' attorneys have been in settlement talks with AC Transit for the past few months. She sued the agency in September 2006. In a court filing two weeks ago, one of her lawyers, Miles Cooper, revealed that Daniels has been out of work for nearly two years and would settle the case for $6.1 million. AC Transit offered $1 million. If the two sides can't reach agreement, the case is scheduled to go to trial February 19 in Alameda County Superior Court.

AC Transit General Counsel Kenneth Scheidig declined to say whether the agency intends to go to trial. But he did contend that Daniels' case was not proof that the Van Hools are unsafe. He said Daniels was not representative of whether the buses pose a risk to riders, because when she fell, she reopened an old skin graft that then became seriously infected. "She got a scratch

on her leg," he said. "To use that as an example is to take this to the extreme."

Nonetheless, it's undeniable that hundreds, perhaps thousands, of East Bay residents with various disabilities, mobility problems, and old injuries ride Van Hools every day, and many of them could be just as vulnerable as Daniels. But it is unclear just how many of them have been seriously hurt, because AC Transit officials said they do not compile detailed rider-injury data based on the types of buses in its fleet.

But despite Scheidig's protests, AC Transit seems to have admitted at least some culpability for Daniels' amputation. Late last year, agency officials ordered the Belgian bus maker to remove the elevated platform directly behind the driver on all new buses it builds for AC Transit.

And in an apparent nod to drivers' complaints, Fernandez and his top staffers also recently ordered Van Hool to jettison the extra doors, and lengthen the wheel base on future buses. As a result, the new Van Hools will be nearly identical to their American-made competitors.□

*Coming next week in part two: European travel, no-bid contracts, "washing" federal funds, and doing an end run around American businesses and workers.*

# EAST BAY EXPRESS

Printed from the East Bay Express Web site:
http://www.eastbayexpress.com/news/belgium_or_bust/Content?
oid=632600

# Belgium or Bust

*As AC Transit's service and finances took a wrong turn, its employees made
more than 100 trips to Europe — possibly for nothing.*

**By Robert Gammon**

**January 30, 2008**

*The Belgian Connection: Second of Two Parts*



Shortly after Rick Fernandez took over as the general
manager of AC Transit, the agency's board of directors
awarded him the authority to approve employee travel.
Sixteen months later, in April 2001, Fernandez and four
of his staffers took an all-expense-paid trip to Europe
that included a visit to the headquarters of the Van Hool
bus company near Antwerp, Belgium. The excursion cost
taxpayers $20,133 — and it was just the beginning.

In the years since, travel records show, AC Transit employees have jetted to Western
Europe on more than one hundred separate occasions. The vast majority of these
junkets were to Belgium, at a total cost to taxpayers of nearly $1 million. The cash-
strapped agency has even paid for an Oakland bus inspector to live near Antwerp for
more than five years, at a cost in excess of $500,000, not including his salary.

Since Fernandez inked an exclusive $60 million deal with Van Hool to supply the
agency's buses, he and other employees also have taken weekend getaways to some of
Europe's most popular destinations, mixing in a little rest and relaxation on the
taxpayers' dime. In fact, as the general manager was on his way to sign the Van Hool
deal in January 2002, he stopped off in Paris and checked into the Normandy Hotel in
the heart of the French capital. The Normandy sits in one of the most exclusive sections
of the city, not far from the Eiffel Tower, one block from the River Seine, and across the
street from the Louvre.

Travel records show that Fernandez' two-day Parisian getaway, including a food
allowance and roundtrip train fare to Brussels to sign the bus deal, cost taxpayers $735.
Three months later, he did it again, spending another weekend at the Normandy at a
total cost of $904. And finally, three months after that, in July 2002, he took a side trip
to Amsterdam before going to Brussels. In all, the general manager has made at least
seven European trips at taxpayers' expense since 2001, totaling $22,983.

In a recent interview, shortly before he was scheduled to catch a plane this week for his

eighth trip to the continent on the taxpayers' dime, Fernandez admitted that he when he goes to Paris or Amsterdam at public expense, he conducts no AC Transit business. The general manager, who is paid $260,000 a year, said he takes the side trips because he needs time before the bus-deal meetings to fend off jet lag and recuperate from long plane flights. "I don't know about you, but it takes me time to get acclimated," he said.

These frequent European excursions represent a substantial yet overlooked public cost of an already expensive bus contract. Since 2002, the Alameda-Contra Costa Transit District has paid more than $97.2 million for 236 Van Hool buses. Last year, the agency obtained an option to buy another 1,500, even though the buses have cost tens of thousands of dollars more than some American-made models in the past and are more expensive to ship.

To bring the Belgian buses to the Bay Area, Fernandez and his staffers had to engage in a series of controversial financial transactions that allowed them to thwart federal laws designed to protect US companies and their union workers. Then last year, without giving American companies a chance to compete for the deal, AC Transit extended its monopoly contract with Van Hool for another five years.

Fernandez raves about the Van Hool buses, arguing that they're more suited to AC Transit's needs and more reliable than their American competitors. He also praises the Van Hool family, which founded and runs the bus company, saying it routinely accommodates the agency's design requests better than any American bus maker would. And he asserts that the employee travel, including stationing an inspector inside the Van Hool bus factory, is necessary to ensure the buses meet his agency's high quality standards.

Nonetheless, there's also little doubt that the agency's costly bus-buying spree and extensive European travel have contributed to AC Transit's financial woes over the past eight years. Since 2000, the agency's costs have skyrocketed, forcing it to repeatedly slash service and raise fares, as it lost millions of passengers. In fact, records show that AC Transit has the worst overall record among the Bay Area's major urban mass transit systems in the past several years. And just last week, the agency's board put off a vote on the general manager's latest proposal to hike fares, which at $2 per passenger would become the Bay Area's most expensive local bus ride.

During that first trip to Belgium, Fernandez was smitten with the Van Hool bus' low floors and three-door design. By the time he returned to the Bay Area, he was convinced the Van Hools were ideal for his plan to create a Bus Rapid Transit system in the East Bay. Known as "BRT," the plan calls for turning the center lanes of some of the East Bay's busiest streets into bus-only lanes.

On May 10, 2001, just six days after returning from that inaugural trip, Fernandez asked the AC Transit board of directors to approve a five-year, no-bid contract with Van Hool. Fernandez told board members that he wanted to buy 135 of the forty-foot, three-door models, and sixty of the sixty-foot accordion-style buses with four doors — each of which had one more door than its American-made counterparts. The sixty-footers would be

.    .

the workhorses of BRT.

But the sole-sourced deal appeared to violate state contracting laws, so the seven-member board voted to solicit bids for new buses. In response, Fernandez and his staff then tailored their request for proposals to specifically fit the Van Hools, thereby eliminating any serious competition from American manufacturers.

AC Transit officials specified that they would only accept proposals for "true low-floor" buses. They contended that low-floor buses, which could be boarded without an extra step up if AC transit were to build special platforms, would speed up commute times, making them ideal for BRT. At the time, several North American bus makers were selling low-floor models. AC Transit had even purchased some from an Alabama manufacturer the year earlier. But those buses had platforms at the rear of the bus that required passengers to walk up a few steps to get to the seats in the back. By contrast, the Van Hools had low floors from front to back, though most seats sit on a one-foot-high platform that requires a step up. Fernandez' staff described the Van Hool's design as "true low-floor," and deemed the Alabama design unacceptable.

The agency also demanded three doors on all its new forty-foot buses and four doors on all the sixty-footers. Fernandez believed the extra door also matched perfectly with BRT, as he envisioned riders with pre-purchased tickets boarding through any one of the vehicle's open doors. Indeed, when he asked the board to award a no-bid contract to Van Hool, he listed seven reasons for approving the deal, and five of them focused on the extra doors.

At the time, there was an American bus maker developing a three-door model with "true" low floors — Orion Bus Industries of New York. But in an interview, Fernandez said that if Orion had submitted a bid, he would not have seriously considered it, because of Van Hool's track record but also because of a previous dispute between his agency and Orion. "We had a bad experience with them," he said. "Van Hool had been building that type of bus, the low-floor bus, for twenty years."

Sure enough, Van Hool was the only bus maker to bid on the deal. One other American manufacturer, Gillig Corporation of Hayward, which had sold more than 120 buses to AC Transit in the early 1990s, asked for and received an extension on the bidding deadline to determine whether it could afford to design and build a new bus for a single customer. But the East Bay bus maker ultimately decided that AC Transit's strict requirements would be too costly, especially after agency officials said they wanted ones with diesel engines and weren't interested in Gillig's eco-friendly hybrid buses.

In December 2001, seven months after Fernandez requested the no-bid contract, the AC Transit board approved virtually the same exclusive five-year deal with Van Hool. But because the Belgian company was the sole bidder, it managed to extract several concessions from the agency. Among them was Van Hool's demand that AC Transit pay all the costs associated with sending employees to training sessions in Belgium, including airfare, hotels, and meals.

Travel records show that no AC Transit employee has spent more time in Belgium than Stuart Thompson. As the agency's on-site bus inspector, Thompson has been living near the Van Hool factory on the taxpayers' dime since September 2002. In addition to his $2,300-a-month flat, AC Transit pays for his cell phone, utilities, and security alarm, plus provides him with a $50-a-day food allowance, including weekends. The public agency even shells out $400 a month for his housekeeper.

But Thompson's most costly expense, according to travel records, is his auto allowance. Instead of riding the bus, AC Transit's European bus inspector seems to prefer traveling by car — at great cost to the public. Taxpayers paid an average of $2,637 a month for Thompson's auto allowance during the past three years. His total Van Hool-related expenses came to at least $529,044 from 2001 to October 2007. And that's not counting his $121,097 annual salary.

Industry experts say that it's not unusual for transit agencies to send inspectors to watch buses being built from the ground up. But if AC Transit had purchased North American-made buses, the agency's expenses would have been far lower. Some transit agencies also keep costs down by hiring inspectors who live near the bus factories. "That way there are no living-away-from-home expenses," said Brian Macleod, senior vice president of Gillig, which manufactures buses for transit agencies throughout the United States and is accustomed to on-site inspectors. "It's a tremendous expense to send someone overseas when you could have contracted with a local inspector."

But Fernandez said the extra costs are worth it. "I, myself, wouldn't hire outside inspectors because I don't believe you get the same commitment to building buses," he said. AC Transit is "very fortunate" to have an experienced inspector such as Thompson who is willing to live in Europe, he added. And Thompson's auto lease is costly, he said, because it includes fuel, maintenance, and insurance. "It's not like he's running around in a stretch limousine."

But he almost could have, for the amount of money AC Transit has shelled out. From late 2004 through June 2007, the agency paid $84,390 for Thompson to lease a car.

Travel records also show that several AC Transit employees have used their trips to Belgium as an extra job perk. Either before or after they visit Van Hool, the employees set off for Madrid, Paris, or London. The employees paid for their train fare, vacation hotels, and spouses, but AC Transit foots the bill for the single biggest expense: airfare. Fernandez said he neither encourages nor discourages such trips, noting that the agency only pays the airfare and the business-related expenses and not the vacation travel. But he also said the relatively cheap European vacations were a good "employee relations" policy.

Yet agency travel records also raise questions as to whether business expenses are all AC Transit pays for. In January 2004, the agency spent $919 on a three-night stay in Paris for Amy Franjesevic, the agency's graphic arts and publicity coordinator. She stayed at the Hotel Saint-Louis along the River Seine. Or consider AC Transit's Marketing and Communications Director Jaimie Levin, one of the biggest cheerleaders for the Van

Hool buses. AC Transit paid for Levin and Charles Kalb Jr., the agency's procurement and materials director, to spend six nights each at a Madrid hotel in May 2003 after they visited Van Hool. The price tag of the excursion was at least $2,974.

Fernandez said Levin, Kalb, and Franjesevic's trips were legitimate business expenses, even though records make no mention of what AC Transit business was involved. Levin and Kalb, he said, went to Madrid for an international bus show and Franjesevic, according to Levin, visited Paris to get a first-hand look at that city's transit marketing design efforts. When pressed as to why these explanations were not mentioned on travel reports, AC Transit General Counsel Kenneth Scheidig said employees should do a better job completing the forms.

Scheidig himself is guilty of the same infraction. Records show that he has traveled to Europe at least five times, costing taxpayers a total of $11,421 — not counting the trip he had scheduled for this week. On at least three of those excursions, he stopped off in Paris for a few days. He did not charge AC Transit for Parisian hotel stays, but the agency paid him $50 a day food allowance in the French capital, though there is no indication on his travel records of what work he had there.

These trips were fairly unusual. After all, lawyers typically exchange documents by e-mail, fax, or FedEx, and don't fly 5,500 miles to hammer out the details of contracts. "We do a lot of contracts with agencies from around the country and they have never once sent their lawyer to negotiate a contract, or for a site inspection, or to visit, or to sign documents, or for any other reason," said Macleod of Gillig bus company.

Scheidig, who makes $217,000 a year, acknowledged that typically it would be unnecessary for him to negotiate the details of a contract in person. But he said Van Hool is a special case because it's so small. "They're a family-run business that wants to see folks face to face," he explained.

In all, AC Transit employees, including Thompson the bus inspector, filed at least 163 travel vouchers for European trips from 2001 to October 2007, the vast majority of which were to Van Hool, totaling $947,238. And in the coming months and years that price tag promises to grow higher. Last week, at Fernandez' request, the AC Transit Board of Directors increased the daily food allowance for international travel to $134, an increase of 168 percent.

Over the past few years, Rick Fernandez and the AC Transit Board of Directors have operated in relative obscurity. Board meetings are sparsely attended and except for some good reporting in the *Berkeley Daily Planet*, and a few stories in the *Oakland Tribune*, the agency's fascination with Belgian buses has gone mostly unnoticed. But that may change as Bus Rapid Transit gets closer to reality.

As details of BRT have surfaced over the past year, the plan has spurred a heated debate throughout the East Bay. Proponents maintain that it is the best way to coax people out of their cars and onto buses, while critics argue that it will cause nightmarish traffic, and send motorists onto quiet neighborhood streets. Currently, the plan is to transform the

two center lanes of Shattuck and Telegraph avenues, International Boulevard, and East 14th Street into bus-only lanes, from downtown Berkeley to either San Leandro or BayFair BART stations. BRT would operate much like a light-rail system, only with buses instead of trains.

Even though the construction of BRT would mean tearing up some of the East Bay's major thoroughfares to build street-center platforms, it does not need the approval of Berkeley, Oakland, or San Leandro, according to AC Transit officials. However, agency Deputy General Manager Jim Gleich said that if any of the cities comes out against the plan, BRT would not go forward. The plan is currently in its final environmental review stage.

This year, as the debate intensifies over BRT, three AC Transit board members will be facing reelection: Joe Wallace, who represents El Sobrante, San Pablo, Richmond, El Cerrito, Albany, Kensington, and parts of Berkeley; Greg Harper, who represents Emeryville, Piedmont, and portions of Berkeley and Oakland; and Board President Chris Peeples, an at-large member. Peeples is one of the staunchest supporters of the Van Hools and he is the only current board member who was on the panel in 1999 when it hired Fernandez to take over the agency and handed him authority over employee travel. He declined to answer questions for this story.

Harper, meanwhile, has expressed the most skepticism about the Belgian buses during the past few years, though he has repeatedly voted to buy them. Harper, who is the immediate past president of the board and a strong proponent of BRT, said in an interview that the Van Hools enjoyed such overwhelming support on the board that he would have lost his ability to get things done had he publicly opposed them.

However, Harper recently indicated that his support for the Van Hools may be waning. Last year, apparently because of safety concerns, AC Transit ordered the manufacturer to redesign all future buses for AC Transit without the raised platforms and extra doors. Now that the new Van Hools will resemble their American competitors, Harper is having second thoughts. In fact, when asked whether the elimination of the buses' extra door and overhaul of the low-floor design meant that buying the Belgian buses was a waste, he responded: "I'd say pretty much it was."

## What Do You Think, Readers?

Whether or not it makes sense to buy Belgian buses has little to do with the underlying issue of Bus Rapid Transit. *Should Berkeley and Oakland support AC Transit's plans for bus-only lanes on Telegraph Avenue and other thoroughfares?*

Go to KitchenDemocracy.com and share your views.